OPINION
{¶ 1} Appellants, Sonja N. Frederic ("Frederic") and Madison McGirr ("Madison"), appeal the judgment entered by the Portage County Court of Common Pleas. The trial court partially granted a motion for summary judgment filed by appellees, Lois Willoughby, Milton Willoughby, Jr., and the estate of Milton Willoughby, Sr. *Page 2 
 {¶ 2} At the relevant times of this matter, Milton Willoughby, Jr. ("Buddy") was an adult male in his 30s. Some witnesses describe Buddy as "incompetent." Buddy lived in a residence with his parents, Milton Willoughby, Sr. ("Mr. Willoughby") and Lois Willoughby ("Mrs. Willoughby").
 {¶ 3} As a child, Buddy bumped his head, which apparently resulted in some level of disability. He attended special education classes in junior high school. However, Buddy was able to graduate from high school in 1985. After high school, Buddy worked at the family trucking business until it closed in the early 1990s. Thereafter, Buddy worked several odd jobs for brief periods of time. Eventually, Buddy applied and was approved for Social Security benefits based on his disability.
 {¶ 4} Buddy was briefly married in 1989, and, during that time, he lived at another residence with his wife. After his divorce, Buddy moved back home with Mr. and Mrs. Willoughby.
 {¶ 5} Buddy married his second wife, Sandra Widuck, in 1995. The couple resided in an apartment in Windham, Ohio for six months. However, they lived in a converted apartment in the basement of the Willoughby's residence for the remainder of their marriage. In March 1995, Buddy and his wife had a son. Neither Buddy nor his wife cared for the child. The child was adopted by Mr. and Mrs. Willoughby, and he lived in the upstairs portion of the residence with them.
 {¶ 6} In the mid-1990s, Buddy was seeing a mental health professional in Kent, Ohio. However, Buddy would not always take the medication that was prescribed for him.
 {¶ 7} Buddy could take care of his personal needs such as feeding and cleaning himself. In addition, he had a driver's license and owned his own automobile. *Page 3 
 {¶ 8} Buddy had various criminal charges against him as an adult, including gross sexual imposition, domestic violence, and impersonating a police officer.
 {¶ 9} In 2000 or 2001, Frederic moved into a residence next door to the Willoughbys. Frederic moved into the residence with her young daughter, Madison. While Frederic was in the process of physically moving into the residence, she found Buddy in her house masturbating with a pair of her underwear. Frederic informed Mr. and Mrs. Willoughby of this incident. In response, Mr. Willoughby hit Buddy. Also, Mr. and Mrs. Willoughby told Frederic that they did not let Buddy do those things and she should let them know if there are any other incidents.
 {¶ 10} On September 17, 2004, Frederic was sleeping in her bedroom. Madison, who was four years old at the time, was sleeping in Frederic's bed with her. Shortly after 4:00 a.m., Frederic awoke to Buddy inserting his fingers into her vagina, while masturbating himself with his other hand. Frederic screamed, and Buddy left. In addition, Frederic called the police.
 {¶ 11} Buddy was charged with rape as a result of this event. In his criminal case, the trial court found Buddy incompetent to stand trial and, after retaining jurisdiction over the matter, committed Buddy to a residential mental health facility.
 {¶ 12} Mr. Willoughby was in poor health at the time of the September 17, 2004 incident. He died in October 2004.
 {¶ 13} Both Frederic and Madison have suffered emotional problems as a result of the September 2004 incident.
 {¶ 14} In January 2005, appellants filed a complaint against appellees. The complaint asserted claims of negligent supervision, negligence, intentional infliction of *Page 4 
emotional distress, negligent infliction of emotional distress, and failure to warn. Appellees filed an answer denying the substantive allegations of the complaint.
 {¶ 15} Appellees filed a motion for summary judgment. Appellees attached portions of Frederic's and Mrs. Willoughby's depositions to their motion. Appellants filed a combined brief in opposition to appellees' motion for summary judgment and a cross-motion for summary judgment. Appellants attached several documents to this pleading, including: (1) a copy of a judgment entry in Buddy's criminal case finding him incompetent, (2) printouts of the dockets of Buddy's criminal cases, (3) a transcript of Frederic's deposition, (4) copies of Frederic's and Madison's responses to appellees' discovery requests, (5) a transcript of Mrs. Willoughby's deposition, (6) an affidavit from Sandra Widuck, and (7) an affidavit from Sharon Richardson, who is Widuck's mother. Appellees filed a response to appellants' cross-motion for summary judgment, a motion to strike Widuck's and Richardson's affidavits, or, in the alternative, a motion for additional discovery pursuant to Civ. R. 56(F). Finally, appellants filed a brief in opposition to appellees' motions.
 {¶ 16} On August 31, 2007, the trial court issued a judgment entry. On appellants' claim against Mrs. Willoughby and the estate of Mr. Willoughby for negligence, the trial court held that there was not a "special relationship" between Buddy and his parents; thus, Mr. and Mrs. Willoughby did not owe a duty to appellants. The trial court granted appellees' motion for summary judgment on this claim. In regard to appellants' claim against Mrs. Willoughby and the estate of Mr. Willoughby for negligent and intentional infliction of emotional distress, the trial court held that neither Mr. nor Mrs. Willoughby were involved in the rape and did not know about the incident until the police arrived at their residence. The trial court granted appellees' motion for *Page 5 
summary judgment in relation to these claims. Pertaining to Frederic's claims against Buddy, the trial court held that Buddy's actions constituted assault and battery. Thus, the court held that Frederic's claims against Buddy are barred by the statute of limitations, since they were not brought within one year of the underlying event. The trial court granted appellees' motion for summary judgment in relation to Frederic's claims against Buddy. In regard to Madison's claims against Buddy, the trial court held that there were genuine issues of material fact and, thus, summary judgment was not appropriate.
 {¶ 17} The trial court's judgment entry did not dispose of Madison's claims against Buddy. In addition, it did not contain language pursuant to Civ. R. 54(B) that there was no just reason for delay. However, appellants voluntarily dismissed the remaining claims pursuant to Civ. R. 41(A). Thus, the trial court's August 31, 2007 judgment entry is a final, appealable order. Kellie Auto Sales, Inc. v. Rahbars RittersEnts., L.L.C., 172 Ohio App.3d 675, 2007-Ohio-4312, at ¶ 8. See, also,Instrumentation Technology, Inc. v. Beacon Ins. Co. of Am. (Apr. 14, 2000), 11th Dist. No. 99-L-036, 2000 Ohio App. LEXIS 1668, at *4-5, citing Denham v. New Carlisle (1999), 86 Ohio St.3d 594. Accordingly, this court has jurisdiction to hear this appeal.
 {¶ 18} Appellants raise the following assignment of error:
 {¶ 19} "The trial court erred in granting appellees' motion for summary judgment."
 {¶ 20} Pursuant to Civ. R. 56(C), summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Dresher v. Burt (1996),75 Ohio St.3d 280, 293. In addition, it must appear from the evidence and stipulations that reasonable minds can come to only one conclusion, which is adverse to the nonmoving party. Civ. R. 56(C). The standard of *Page 6 
review for the granting of a motion for summary judgment is de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
 {¶ 21} "Since summary judgment denies the party his or her `day in court' it is not to be viewed lightly as docket control or as a `little trial.' The jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party. In Dresher v.Burt, the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The evidence must be in the record or the motion cannot succeed. The moving party cannot discharge its initial burden under Civ. R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ. R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ. R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in Misteff v.Wheeler (1988), 38 Ohio St.3d 112.
 {¶ 22} "* * *
 {¶ 23} "The Supreme Court in Dresher went on to hold that whenneither the moving nor nonmoving party provides evidentiary materials demonstrating that there are *Page 7 
no material facts in dispute, the moving party is not entitled to a judgment as a matter of law as the moving party bears the initial responsibility of informing the trial court of the basis for the motion, `and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.' [Dresher v. Burt, 75 Ohio St.3d at 276.]"Welch v. Ziccarelli, 11th Dist. No. 2006-L-229, 2007-Ohio-4374, at ¶ 40-42. (Emphasis in original.)
 {¶ 24} We will first address appellants' contention that the trial court erred in granting summary judgment in favor of Mr. and Mrs. Willoughby on their claims of negligent supervision, negligence, and failure to warn.
 {¶ 25} The Supreme Court of Ohio has held that "in order to establish a cause of action for negligence, the plaintiff must show (1) the existence of a duty, (2) a breach of duty, and (3) an injury proximately resulting therefrom." Armstrong v. Best Buy Co., Inc., 99 Ohio St.3d 79,2003-Ohio-2573, at ¶ 8, citing Menifee v. Ohio Welding Prod., Inc.
(1984), 15 Ohio St.3d 75, 77.
 {¶ 26} "To prevail in a negligent supervision complaint, plaintiffs must show that: (1) the parents know of their child's particular reckless or negligent tendencies (thus knew they needed to exercise control over him); (2) the parents had the ability to exercise control; and (3) the parents did not exercise that control." Hau v. Gill (July 14, 1999), 9th Dist. No. 98CA007061, 1999 Ohio App. LEXIS 3258, at *5. (Citations omitted.)
 {¶ 27} A "failure to warn" cause of action asserts that the defendants failed to fulfill their overall duty to the plaintiffs. See Estates ofMorgan v. Fairfield Family Counseling Ctr (1997), 77 Ohio St.3d 284,306. On appeal, appellants do not cite case law in support of this cause of action or address it in detail. *Page 8 
 {¶ 28} Since the causes of action for negligence and negligent supervision are similar, the "failure to warn" cause of action goes to appellees' overall duty, and the fact the trial court focused its analysis on appellees' general duty to appellants, we will address these causes of action in a consolidated analysis, also focusing on the duty owed to appellants.
 {¶ 29} In this matter, the primary question is whether Mr. and Mrs. Willoughby had a duty to appellants to protect them from Buddy. In Ohio, "the existence of a duty depends on the forseeability of the injury." See Littleton v. Good Samaritan Hospital Health Ctr. (1988),39 Ohio St.3d 86, 92. (Citations omitted.) In addition, the Supreme Court of Ohio has held "there is no duty under Ohio law to control the conduct of another person so as to prevent him from causing physical harm to another unless a `special relation' exists between the actor and that person which imposes a duty upon the actor to control the person's conduct." Id. "Such a `special relation' exists when one takes charge of a person whom he knows or should know is likely to cause bodily harm to others if not controlled." Id. Therefore, "`[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.'"Estates of Morgan v. Fairfeld Family Counseling Ctr,77 Ohio St.3d at 294, quoting Restatement of the Law 2d, Torts (1965), Section 319. In interpreting Littleton v. Good Samaritan Hospital Health Ctr. in relation to a parent's duty regarding an adult child, the Second Appellate District has held:
 {¶ 30} "While the relationship between a parent and an adult childmay, under certain circumstances, be a `special relationship' that instills in the parent a duty to protect others from the violent propensities of the adult child, such a relationship does *Page 9 
not exist automatically by virtue of the parent-child relationship itself. Rather, it is our view that such a responsibility exists only if the parent has accepted such responsibility in a legally recognized way, such as a guardianship, or in a situation where an adult child's dependence and the parent's overt acceptance of responsibility for the adult child establish a de facto guardianship." Shirdon v. Houston, 2d Dist. No. 21529, 2006-Ohio-4521, at ¶ 18. (Emphasis in original.)
 {¶ 31} There are three underlying questions in this matter. First, did Buddy pose a risk to others? Second, were Mr. and Mrs. Willoughby aware of Buddy's condition and the resulting risk it posed to others? Finally, did Mr. and Mrs. Willoughby accept responsibility for Buddy's actions and take charge of him?
 {¶ 32} We will first address whether there was evidence that Buddy posed a risk to others and whether Mr. and Mrs. Willoughby knew about that risk.
 {¶ 33} Widuck acknowledged that the trial court in Buddy's criminal case found that Buddy was incompetent on September 9, 2005. She stated that Buddy's mental state had not deteriorated prior to that date; instead, she stated that "Buddy was the way he had always been." The inference is that Buddy had always been incompetent and was incompetent during the times appellants lived next door to the Willoughbys.
 {¶ 34} Frederic stated that Buddy was "not right." She stated that when she told Mr. and Mrs. Willoughby about the masturbation incident, one of them told her Buddy was hit on the head or hit by a truck. Widuck stated that Mrs. Willoughby told her Buddy was "that way" because he hit his head when he was a child. The evidence that Mr. and/or Mrs. Willoughby told Widuck and Frederic that Buddy was "that way" because he hit his head or was hit by a truck is evidence that they were aware of Buddy's condition, in that they offered an explanation for his condition. *Page 10 
 {¶ 35} Sharon Richardson is Widuck's mother. Richardson stated in an affidavit that she informed Mrs. Willoughby that Buddy attempted to purchase sexual intercourse from her niece.
 {¶ 36} Mrs. Willoughby testified by way of deposition. Generally, she stated that she did not know about Buddy's behavioral problems or, when asked about specific instances, she could not remember them. When asked to characterize Buddy's mental capacity prior to September 2004, Mrs. Willoughby responded that "he acted normal to me." And, when asked if Buddy was "slow in any way," she responded "not really." However, she also responded as follows:
 {¶ 37} "Q. What is the name of the facility that Buddy is in now?
 {¶ 38} "A. Heartland Behavioral Facility.
 {¶ 39} "Q. And what is your understanding of that facility?
 {¶ 40} "A. Just he's got a problem, he is incompetent.
 {¶ 41} "Q. Okay. And for what reason is he incompetent, do you know?
 {¶ 42} "A. I don't know.
 {¶ 43} "Q. Did you ever ask anybody about that?
 {¶ 44} "A. No. The judge put him there so — "
 {¶ 45} In her deposition, Mrs. Willoughby stated that she was aware of an incident involving Buddy at Tinker's Creek Park, but did not really know what the incident was about. However, Widuck stated that Mrs. Willoughby advised her that Buddy was charged and convicted of two counts of gross sexual imposition for an incident that occurred in 1992 at Tinker's Creek Park and that Buddy spent two years in prison for these offenses. *Page 11 
 {¶ 46} Widuck stated that Mr. and Mrs. Willoughby were aware (1) that Buddy was arrested in 1995 for impersonating a police officer and spent two days in jail relating to this incident; (2) that Buddy was arrested in 1998 for domestic violence and spent a day in jail relating to this incident; (3) that Buddy was arrested in 1999 for gross sexual imposition regarding an incident where Buddy allegedly touched a blind woman with his penis; (4) of Buddy's mental incapacity and violent and sexual nature; (5) that Buddy had a propensity to leave the house late at night; (6) that Buddy was unable to be employed due to his mental incapacity; (7) that Buddy was collecting Social Security income due to his mental incapacity; (8) that Buddy needed psychological help; (9) that Buddy refused to take his medication; and (10) that Buddy had an attraction to Frederic and sought to see her.
 {¶ 47} Richardson also stated that Mr. and Mrs. Willoughby were aware of Buddy's "sexually deviant conduct, dangerous and violent propensities, and mental incapacity." Similarly, Widuck stated that Mr. and Mrs. Willoughby "were aware of Buddy's mental incapacity, [and] violent and sexual nature."
 {¶ 48} For the purposes of summary judgment, there was sufficient evidence presented to create a genuine issue of material fact as to whether Buddy posed a risk to others and whether Mr. and Mrs. Willoughby were aware of that risk.
 {¶ 49} Next, we will address whether there was evidence showing that Mr. and Mrs. Willoughby took charge of Buddy and accepted responsibility for him.
 {¶ 50} Widuck stated, in regard to Buddy's criminal matters, that Mr. and Mrs. Willoughby bailed Buddy out of jail, attended court with Buddy, and paid for his legal expenses. Widuck stated that Mr. and Mrs. Willoughby scheduled and paid for a vasectomy due to Buddy's violent and sexual nature. Widuck stated that Mrs. *Page 12 
Willoughby demanded to adopt Buddy's son, in order to protect the child from Buddy's "propensities and incapacity." Further, Widuck stated that Mr. and Mrs. Willoughby knew that Buddy had a tendency to try and leave home at night and, therefore, they ordered Buddy to stay in the house. Also, Widuck stated Mr. and Mrs. Willoughby would take Buddy's car keys from him to prevent him from leaving the house. Finally, Widuck stated that Mr. and Mrs. Willoughby drove Buddy to see a counselor.
 {¶ 51} In regard to the conversation between herself and Mr. and Mrs. Willoughby, Frederic stated the following in her deposition:
 {¶ 52} "Q. Did [Lois or Milton Willoughby Sr.] ever say anything to you or did you ever learn anything to suggest that they knew [Buddy] was coming over to your house [on September 17, 2004]?
 {¶ 53} "A. No, but the last — the masturbation incident, I was told, if you have any problems, you come see me.
 {¶ 54} "Q. Okay. But what I'm asking —
 {¶ 55} "A. Mr. Willoughby, you know — you know, they were saying that, we don't allow him out of the house, we don't allow him to do these things, you know, you come to me."
 {¶ 56} Richardson stated that when she informed Mrs. Willoughby that Buddy attempted to purchase sexual intercourse from her niece, Mrs. Willoughby responded by saying that she would take care of it.
 {¶ 57} There was evidence in the record that Mr. and Mrs. Willoughby constantly monitored Buddy. Frederic stated that Mr. and Mrs. Willoughby "always had an eye on" Buddy. She also stated that any time Buddy was outside, Mr. or Mrs. Willoughby was *Page 13 
also outside. Also, Widuck stated that Mr. and Mrs. Willoughby "found it necessary to monitor all of Buddy's activities."
 {¶ 58} Apparently, there was a fence surrounding the Willoughbys' property. Frederic stated that whenever Buddy would get close to the fence, Mr. Willoughby would call him back. Also, Frederic stated that Buddy's situation was a "big joke in the neighborhood." She stated Buddy would occasionally leave the fenced-in area, and another neighbor would yell at Buddy to get back in the fence, and Buddy would run back inside the fence. This evidence suggested that Buddy was under someone's control and was not permitted to leave the fenced-in area of the property.
 {¶ 59} Further, there was evidence that Mr. and/or Mrs. Willoughby physically beat and verbally abused Buddy as methods of discipline. Frederic stated that Mr. Willoughby beat Buddy when she informed Mr. and Mrs. Willoughby about the initial masturbation incident. In addition, Frederic stated that "[Buddy] was beaten, oh my God. And, you know, just walking to and fro, the parents would beat him. I mean, it was very public." Richardson stated that Mr. and Mrs. Willoughby would verbally abuse Buddy for his behavior.
 {¶ 60} Thus, there was evidence presented that Mr. and Mrs. Willoughby did the following: (1) provided a residence for Buddy to live in, (2) adopted Buddy's child to protect him from Buddy, (3) scheduled and paid for a vasectomy for Buddy, (4) monitored Buddy's behavior, (5) took steps to control Buddy's behavior, (6) restricted Buddy's ability to leave the property, (7) represented to other people that they would take care of Buddy's behavior, and (8) physically and verbally disciplined Buddy for inappropriate actions. Specifically, the evidence that Mr. and Mrs. Willoughby attempted to control Buddy's behavior, restricted his ability to freely leave the property, *Page 14 
and disciplined him for improper conduct suggests that they took charge of Buddy and accepted responsibility for him.
 {¶ 61} Additionally, there is evidence in the record that the Willoughbys directly assured Frederic after the initial masturbation incident that they did not "allow [Buddy] to do these things" and told Frederic to come to them if she had any other problems. Based on this evidence, the Willoughbys may have owed appellants a greater duty than that owed to a member of the general public. This is because the Willoughbys' direct representations to Frederic after a similar incident informed Frederic that the Willoughbys knew about Buddy's behavior and that they attempted to control his behavior. Finally, their representation to Frederic to come to them if she had any additional problems suggests that the Willoughbys accepted responsibility for Buddy's actions.
 {¶ 62} Accordingly, there was evidence presented, upon which a trier-of-fact could conclude, that Mr. and Mrs. Willoughby owed appellants a duty to protect them from Buddy's actions. In addition, we note there was evidence presented suggesting that Mr. and Mrs. Willoughby breached this duty, and that the breach was the cause of appellants' injuries.
 {¶ 63} Appellees argue that Widuck's and Richardson's affidavits should not be considered because they contain inadmissible hearsay. We note appellees filed a motion to strike Widuck's and Richardson's affidavits. The trial court did not rule on appellees' motion to strike. Thus, it is presumed that the trial court denied the motion. Tenan v.Huston, 165 Ohio App.3d 185, 2006-Ohio-131, at ¶ 53, citing Niepsuj v.Niepsuj, 9th Dist. No. 21888, 2004-Ohio-4201, at ¶ 10. Appellees have not filed a notice of cross appeal pursuant to App. R. 3(C)(1), which provides: *Page 15 
 {¶ 64} "A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment ororder, shall file a notice of cross appeal within the time allowed by App. R. 4." (Emphasis added.)
 {¶ 65} Since appellees have not properly raised this perceived error, we will not disturb the trial court's ruling on appellees' motion to strike. Wilson v. Szabo (Mar. 31, 2000), 11th Dist. No. 98-P-0128, 2000 Ohio App. LEXIS 1432, at *14. See, also, Carnahan v. Ohio Dept. of HumanServ. (2000), 139 Ohio App.3d 214, 220, and Williams v. Spitzer AutoWorld, 9th Dist. No. 07CA009098, 2008-Ohio-1467, at ¶ 23.
 {¶ 66} Next, we will address appellants' assertion that the trial court improperly granted appellees' motion for summary judgment on their claims against the estate of Mr. Willoughby and Mrs. Willoughby for intentional and negligent infliction of emotional distress.
 {¶ 67} "In a case for intentional infliction of emotional distress, a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." Phung v.Waste Mgt., Inc. (1994), 71 Ohio St.3d 408, 410. (Citation omitted.)
 {¶ 68} Appellants have produced no evidence that Mr. or Mrs. Willoughby intended to cause them emotional distress. Mr. and Mrs. Willoughby were asleep on the night of the September 2004 incident. They did not instruct Buddy to go to Frederic's house and commit the sexual acts against her. At most, appellants have provided evidence, which, if believed by a trier-of-fact, could establish that Mr. and Mrs. *Page 16 
Willoughby were negligent in failing to monitor and/or control Buddy's behavior on the night in question. However, such negligence does not support a claim of intentional infliction of emotional distress. The trial court did not err by entering summary judgment in favor of Mr. and Mrs. Willoughby on appellants' claim of intentional infliction of emotional distress.
 {¶ 69} Next, we turn to appellants' claim of negligent infliction of emotional distress against Mr. and Mrs. Willoughby. In order to prevail on a claim of negligent infliction of emotional distress, appellants "must demonstrate that [they were] subjected to actual physical peril, and, as a result, suffered severe and debilitating emotional injuries."Tackas-Davis v. Concord Castings, Inc. (Dec. 15, 2000), 11th Dist. No. 99-L-035, 2000 Ohio App. LEXIS 5920, at *18, citing Heiner v.Moretuzzo (1995), 73 Ohio St.3d 80, 85-87. In addition, they must show that the physical peril was caused by Mr. and Mrs. Willoughbys' negligent act. Id.
 {¶ 70} As we discussed supra, appellants have presented sufficient evidence to create a genuine issue of material fact as to whether Mr. and Mrs. Willoughby were negligent in failing to control Buddy's behavior and permitting Buddy to leave their residence and enter Frederic's home. Moreover, there was evidence that appellants were in actual physical peril at the time of the incident. There was evidence in the record that an adult male with mental incapacity and a tendency for violent and sexual conduct was in their bedroom while they were asleep. Further, Buddy actually acted on his sexual impulses by inserting his fingers into Frederic's vagina. In addition, he exposed himself in front of Frederic and Madison, who was only four years old at the time. Finally, there was evidence presented that both Frederic and Madison suffer from emotional injuries as a result of the incident that occurred in September 2004. Frederic *Page 17 
stated that, as a result of this incident, Madison has suffered from nightmares; developed a fear of men, especially strangers; started wetting the bed; and has had to see a speech therapist. In regard to herself, Frederic stated that she had emotional problems as a result of the incident, which led to problems with keeping jobs and caused her to relapse into drug use.
 {¶ 71} Appellants presented sufficient evidence to create a genuine issue of material fact on their claim for negligent infliction of emotional distress against Mr. and Mrs. Willoughby.
 {¶ 72} Finally, we turn to appellants' argument that the trial court improperly granted appellees' motion for summary judgment on Frederic's claims against Buddy.
 {¶ 73} An action for assault or battery must be brought within one year from the date the alleged incident occurred. R.C. 2305.111(B)(1). An action for negligence is subject to a two-year statute of limitations. R.C. 2305.10.
 {¶ 74} Frederic's claims against Buddy were negligence and negligent and intentional infliction of emotional distress. However, the trial court found that the true nature of the causes of action against Buddy were assault and battery. Therefore, the trial court granted summary judgment in favor of appellees on these claims, since they were not brought within the requisite one-year statute of limitations.
 {¶ 75} We must look to the "true nature or subject matter" of the purported acts upon which the complaint is based. Doe v. First UnitedMethodist Church (1994), 68 Ohio St.3d 531, 536, citing Hambleton v.R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183. In Doe, the plaintiff sought to recover on theories of negligence and intentional infliction of emotional distress for alleged acts of sexual abuse. Doe v. FirstUnited Methodist Church, 68 Ohio St.3d at 532. The Supreme Court of Ohio has held that the *Page 18 
"acts of sexual contact with appellant were clearly intentional acts of offensive touching — sexual abuse is not something that occurs by accident." Id. at 536. Further, the court held "that a cause of action premised upon acts of sexual abuse is subject to the one-year statute of limitations for assault and battery." Id. at 537.
 {¶ 76} In this matter, appellants allege that Buddy committed acts of sexual abuse against Frederic. As was the case in Doe, the true nature of subject matter of appellants' complaint was "clearly intentional acts of offensive touching." Id. at 536.
 {¶ 77} Appellants argue that Buddy lacked the mental capacity to form the intent to commit assault and battery. Appellants cite NationwideMut. Fire Ins. Co. v. Turner (1986), 29 Ohio App.3d 73 in support of their argument that Buddy was incapable of forming the intent required to commit assault and battery. In Nationwide Mut. Fire Ins. Co. v.Turner, the Eighth Appellate District addressed the issue of an individual's mental state in relation to a clause in a homeowner's insurance policy that excluded intentional acts. Id. at 75. The Supreme Court of Ohio has also addressed this issue:
 {¶ 78} "When disputed, the determination whether an insured lacked the mental capacity to commit an intentional act is a matter to be determined, in the first instance, by a trial court and such determination is to be made by the trial court on the basis of the evidence. Such a determination will not be disturbed, absent an abuse of discretion." Nationwide v. Estate of Kollstedt (1995),71 Ohio St.3d 624, paragraph two of the syllabus.
 {¶ 79} Contrary to appellants' contention, neither of these cases stands for the proposition that an insane person cannot commit the tort of assault and battery. It is important to note that both of these cases concerned an exclusionary clause for intentional acts, which was contained in a homeowners' insurance policy. "An *Page 19 
insurance policy is a contract." Westfield Ins. Co. v. Galatis,100 Ohio St.3d 216, 2003-Ohio-5849, at ¶ 9. Accordingly, the parties to an insurance contract are free to specifically exclude insurance coverage for intentional acts. However, that does not mean that an incompetent person who commits an intentional act is immune from liability to the injured party. It only means, in circumstances where the exclusion applies, that no insurance coverage exists.
 {¶ 80} "A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful or offensive contact results. * * * Contact which is offensive to a reasonable sense of personal dignity is offensive contact. * * *" Love v.Port Clinton (1988), 37 Ohio St.3d 98, 99. (Internal citations omitted.)
 {¶ 81} Appellants assert that since the tort of battery requires that an individual intend to cause a harmful or offensive contact, the mental capacity of the alleged tortfeasor must be examined to determine if he or she was capable of forming the requisite intent. The Eighth District has addressed this issue and held that "an insane or mentally disordered person is civilly liable for committing an assault and battery."Clark v. Estate of Halloran (Jan. 13, 1994), 8th Dist. No. 64576, 1994 Ohio App. LEXIS 74, at *6. The Eighth District noted that "[w]hile Ohio state courts have not specifically addressed this issue, case law from other jurisdictions has consistently held that an insane or otherwise mentally disordered person is civilly liable for injuries resulting from an assault and battery." Id., citing Williams v. Kearbey (Kan.App. 2d 1989), 775 P.2d 670; Polmatier v. Russ (Conn. 1988), 537 A.2d 468;Spaulding v. U.S. (D.Me. 1985), 621 F.Supp 1150; and Kaczer v.Marrero (Fla. 1976), 324 So.2d 717. Finally, the Eighth District quoted the following portions of the Restatement of Torts: *Page 20 
 {¶ 82} "`One who has deficient mental capacity is not immune from tort liability solely for that reason.
 {¶ 83} "`Comment:
 {¶ 84} "`a. * * * insane persons are liable for their torts and have no immunity by reason of their insanity; and this is true for any lesser degrees of mental incompetence.
 {¶ 85} "`b. Accordingly, insane persons have been held liable for their intentional torts, such as assault and battery.'" Id. at *5, fn. 3, quoting Restatement of the Law 2d, Torts (1979), Section 895, Comments a and b.
 {¶ 86} We agree with the Eighth District's analysis and hold that mentally deficient individuals are capable of committing intentional torts such as assault and battery.
 {¶ 87} The trial court properly granted appellees' motion for summary judgment in relation to Frederic's claims against Buddy, as the true nature of the subject matter of these claims was an intentional, offensive touching and, thus, the claim needed to be brought within one year of the incident pursuant to R.C. 2305.111(B)(1).
 {¶ 88} Appellants' assignment of error has merit to the extent indicated.
 {¶ 89} The judgment of the trial court is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with this opinion.
DIANE V. GRENDELL, P.J., concurs,
MARY JANE TRAPP, J., concurs in part, dissents in part, with Concurring/Dissenting Opinion. *Page 21